| | | |
|---|---|---|
| **SHARI WAGNER** <br> 125 Monument Drive <br> Boonsboro, MD 21713 | * | IN THE |
| | * | CIRCUIT COURT |
| (As Parent for AUDRIANA WAGNER, Minor Child And Suffering, Individually and as Parent and Next Friend of AUDRIANA WAGNER, A Minor) | * | MARYLAND FOR |
| | * | WASHINGTON COUNTY <br> C-21-CV-23-000298 |
| Plaintiff, | * | CIVIL CASE NO.: _____ |
| vs. | * | |
| **NVR, INC. d/b/a RYAN HOMES** <br> Tax Dept <br> Suite 500 <br> 11700 Plaza America Drive <br> Reston, VA 20190-4751 | * | |
| | * | |
| and | * | |
| **RYAN HOMES** <br> Suite #500 <br> 656 Quince Orchard Rd <br> Gaithersburg, MD 20878 | * | |
| | * | |
| **JOHN DOE** | | |
| | * | |
| Defendant(s). | | |
| * * * * * * * * * * * * * | | |

## COMPLAINT

TO THE HONORABLE, THE JUDGE(S) OF SAID COURT:

NOW COMES, Shari Wagner, as Parent for AUDRIANA WAGNER, Minor Child And Suffering, Individually, and as Parent and Next Friend of AUDRIANA WAGNER, A Minor (hereinafter referred to as "Plaintiff"), by and through her attorney, Donnell H. McNeal of the Law Offices of Donnell H. McNeal, LLC and files this Complaint pursuant to Maryland Rule Annotated Code §§2-101, 2-124, 2-301, 2-302, 2-303 and 2-305 against NVR, Inc. d/b/a Ryan Homes and JOHN DOE (hereinafter referred to jointly as "Defendants"). In further support, Plaintiff states the following:

### INTRODUCTORY STATEMENTS

1. This is an action for (i) damages and (ii) indemnification.

**EXHIBIT 1**

2. This case involves a defectively elevated sidewalk installed by Defendant-Ryan Homes that caused the Plaintiff to suffer a fractured left leg which required surgery.

3. During the time of the accident, the Plaintiff, a 13-year-old female high school honor-roll student who excelled at her martial arts dojo.

4. As a result of injuries sustained in the common areas (i.e., sidewalk) of Defendants' premises, the Plaintiff suffered for 405 days or 57 weeks from the symptomatology associated with the injuries sustained in the accident.

## JURISDICTION AND VENUE

5. Pursuant to Md. Code Ann. Cts. & Jud. Proc. § 1-501 this court has subject matter jurisdiction over this suit as this case arises under the laws of Maryland and this court is the highest common-law and equity court of record exercising original jurisdiction within the State. This Court has full common-law and equity powers and jurisdiction in all civil cases within the county.

6. Pursuant to Md. Code Ann. Cts & Jud. Proc § 6-201 venue is proper as this court is located in the county where both defendants regularly carry out business and where the accident took place.

## COUNT I
## PREMISE LIABILITY/NEGLIGENCE

7. Plaintiff incorporates by reference as if fully stated herein averments 1 through 6.

8. This claim arises from an incident where your company and/ or its agents, assigns, contractors or subcontractors caused the concrete that was laid over the storm drain to be unreasonably elevated when it should have been equally level with the adjoining sidewalk concrete and resulted in serious injuries to a 13-year-old female. **[EXHIBIT A]**[1]

9. On 11/28/18, the Plaintiff's family settled on a newly constructed home located at 125 Monument Drive, Boonsboro, MD 21713. The following day, the Plaintiff's family moved into the home. While the Plaintiff's mother was waiting for ADT and Verizon companies to come out to connect the security, internet, cable tv and phone services, the Plaintiff's mother met Ryan Hart as he was in the neighborhood inspecting and checking on repairs to neighbors' homes.

10. There were some immediate family concerns about imperfections inside and outside of the home so Plaintiff's mother approached Mr. Hart to complaint about multiple new

---

[1] [A] Pictures

2

home issues. Mr. Hart informed Plaintiff's mother that she had a full thirty (30) days to bring to Defendant-Ryan Homes attention any problems, issues or complaints about her home. Mr. Hart went even further to advise Plaintiff's mother to direct any issues and/or concerns with the new home to his attention as he was the proper person to handle such issues and/or concerns and that he would frequently be in the neighborhood for the next several weeks.

11. Sometime during December 2018 (within the first thirty (30) days living in the new home) while both the Plaintiff's parents were smoking in their garage, they witness a couple walking a dog in front of their home and witnessed a women tripped and fall. Plaintiff's parents wondered what happened. When Plaintiff's parents went out to discover the cause of the trip and fall, they noticed that there was an elevation in the concrete between sidewalk and the storm drain. Plaintiff's mother even witnessed other people trip, stumble and fall over that same area near the storm drain, so she actually brought the tripping hazard to the attention of Mr. Hart the next time she saw Mr. Hart in the neighborhood during the month of December.

12. The Plaintiff's mother saw Mr. Hart in the neighborhood as she was leaving for work early one morning and informed Mr. Hart that the concrete near the storm drain was a tripping hazard and needed to be repaired and pointed out the area. However, Mr. Hart informed Plaintiff's mother that she didn't need to concern herself with property that was not hers and assured Plaintiff's mother that the developer would ensure that all sidewalk issues were corrected prior to turning the neighborhood over to the county. Mr. Hart dismissed Plaintiff's mother concerns and suggested that she focus solely on the issues concerning her home.

13. On June 19, 2020 at approximately 1:00 P.M., (less than two months after Plaintiff's mother complained about the hazardous condition of the sidewalk) the Plaintiff was playing outside directly in front of her home riding a skateboard on the concrete sidewalk juxtapose to the concrete of the storm drain. **[EXHIBIT B]**[2] The mother of the Plaintiff purchased the skateboard in an effort to encourage the Plaintiff to get some vitamin D from the sun and outside exercise because the Plaintiff had been cooped up in the new home because of Corona virus concerns.

14. The Plaintiff's mother had warned the Plaintiff's other younger siblings about playing anywhere near the storm drain approximately a month earlier, but failed to communicate the same message to the eldest sibling, the Plaintiff because the Plaintiff did not really play outside much.

15. On 6/19/20, the day when the Plaintiff decided to try out the skateboard, she had both feet on the skateboard (i.e., left foot in the front with the right foot in the back) when the

---

[2][B] Copy of the purchase order for the skateboard the Plaintiff was riding on 6/19/20.

3

skateboard came to an immediate abrupt stop which threw the Plaintiff off the skateboard. The Plaintiff landed on her left leg, twisting it and falling to the ground in excruciating pain on her left side. The Plaintiff suffered a displaced fracture of the left tibial spine. Plaintiff did not notice any difference between in the height of the two different portions of sidewalk until the skateboard wheel was stopped by the one (1") inch raise in the storm drain concrete.

16. The Plaintiff parents had only recently purchased the skateboard for the Plaintiff with knee, elbow and wrist pads. **[EXHIBIT C]**[3] The Plaintiff was wearing a pair of black Vans tennis shoes during the time of the accident. **[EXHIBIT D]**[4]  Weather was not a factor on the day of the incident according to the National Oceanic & Atmospheric Administration. **[EXHIBIT E]**[5]

17. The Plaintiff was indeed a business invitee as the Plaintiff was a member community as her parents actually purchased their home from Defendant-Ryan Homes on 11/28/18, the very day the Wagner family went to settlement and actually moved into their home the following day on 11/29/18. **[EXHIBIT F]**[6]  Hence, the Plaintiff is a business invitee for the mutual benefit of the proprietor (i.e., Resident of one of the homes Defendant-Ryan Homes/NVR was in the business of selling).

18. Prior to Plaintiff being injured by the hazardous incline in the sidewalk concrete which abuts the concrete for the storm drain, Plaintiff's mother informed Mr. Hart about the tripping hazard and advised him that she has witness others either trip/almost trip and fall on that very portion of concrete on the community sidewalk. However, Plaintiff's mother was all but dismissed, practically ignoring and advised that Defendant-Ryan Homes would be inspecting all concrete and making necessary repairs prior to the community prior to the community being turned over to the County. Mr. Hart also advised the Plaintiff's mother that she should focus more on the issues that need to be corrected on and about her home and not the issues concerning property that she did not own. Therefore, it is clear that Defendant-Ryan Homes knew and had reason to know about the tripping hazard of the concrete sidewalk near the front of the Plaintiff's family home located in front of 125 Monument Drive, Boonsboro, MD 21713.

---

[3] [C] Copy of he receipt for the skateboard protective gear that Plaintiff was wearing on 6/19/20.

[4] [D] Picture of the shoes the Plaintiff was wearing during the time of the accident on 6/19/20

[5] [E] NOAA record of climatological observations for zipcode 21713 on 6/19/20.

[6] [F] Copy of the Maryland Department of Assessments and Taxation real property verification of ownership from its public site.

4

19. Defendant-Ryan Homes failed to take reasonable and ordinary care to maintain the premises safely for the invitees that lived on and about Monument Drive, in Boonsboro, Maryland in order to protect them against injury caused by the unreasonable risk which the Plaintiff by exercising ordinary care would not have and did not discovered prior to being injured. Progressive steps like placing yellow/orange cones and/or tape could have been placed in the area of the hazard in order to warn others walking on or about the sidewalk until Defendant-Ryan Homes was able to make the necessary corrective safety improvements; however, this was not done. Interestingly enough, it would not have cost Defendant-Ryan Homes anything additional to make the area safer than it was on the day the Plaintiff's parents made Mr. Hart aware of the sidewalk hazard.

20. However, rather than safeguard the area, Defendant through the actions of Mr. Hart disregard and insensitivity for the concerns of the Plaintiff's family eventually lead to the Plaintiff suffering a very serious injury. Every construction company keeps safety tape and warning cones equipment at their disposal just like every carpenter has a hammer. So, to maintain such equipment as a regular part of the business, Defendant-Ryan Homes failure to use such safety equipment is tantamount to a negligently/recklessly disregard for the health, safety and welfare of the very business invites that Defendant-Ryan Homes actually just sold a home to for hundreds of thousands of dollars. Some might say that the disregard actually amounts to egregious conduct. Therefore, Defendant-Ryan Homes are vicariously liable for the injury that the Plaintiff sustained in the open/common areas of Defendant-Ryan Homes property in the Sycamore Run Subdivision of that Boonsboro, Maryland community.

21. Alternatively, it is clear that the Defendant (s) breached their duty of reasonable care under the circumstances after receiving notification of the reasonable and potential danger that has a reasonable likelihood of harming a business invitee and failed to properly protect the business invitee against the potential harm. There are actually many things that the Defendant (s) could have reasonably done to protect the Plaintiff against injury. However, nothing was done to correct the dangerous portion of concrete sidewalk area that residents, visitors and children are certainly expected to walk, run, play and otherwise travel on.

22. But for the Defendant's failure to take reasonable steps to protect the Plaintiff-business invitee of known dangers, the accident which produced the Plaintiff's injuries would have never happened. This is what some refer to as cause-in-fact or causal connection between the breach of duty and the harm suffered.

23. The injuries the Plaintiff-business invitee suffered are the direct and foreseeable consequence of the Defendant's breach of duty of care under the circumstances. Therefore, the proximate cause element of this *prima facie* case for premise liability/negligent maintenance/construction is satisfied.

24. Clearly, it was not very important for Defendant-Ryan Homes to repair or safeguard the danger presented by the hazardous portion of the sidewalk near Plaintiff's home until the Plaintiff was seriously injured. Only after the Plaintiff was injured did Defendant-Ryan Homes decide to actually make the necessary repairs. **[EXHIBIT G]**[7]

## INJURY & TREATMENT

25. On 6/19/20, the ambulance was called and responded to the Plaintiff's trip and fall from a skateboard. When the ambulance responded, the Plaintiff was seated in her mother's vehicle with the door open and was vomiting in a bucket. The Plaintiff had a pale and diaphoretic with ice applied to her left knee. The Plaintiff was placed on a cardiac monitor, placed on a Stretcher and given 10mg of Ketamine for pain and 8mg of Zofran for vomiting and nausea. **[EXHIBIT H]**[8]

26. On 6/19/20 when the Plaintiff was transported to the hospital with a chief complaint of the left knee. The Plaintiff only thought she had twisted her knee. The Plaintiff's left knee was swollen and in pain with range of motion and palpation. Upon examination, Plaintiff's left knee showed positive signs for joint stiffness, effusion and swelling. The Plaintiff did not allow the doctor to perform a range of motion test because of pain. Out of a concern for hemarthrosis, an X-ray was taken. Plans were set to obtain an MRI of the left knee. Pain control, ambulation on crutches and advising Plaintiff non-weight bearing efforts were the focus. While Plaintiff's left knee was at rest on a pillow, the pain was rated at a 5/10. However, when asked to take her shorts off, the Plaintiff was in too much pain, so the decision was made with the approval of the Plaintiff's mother to cut Plaintiff's shorts off. The Plaintiff was diagnosed with internal derangement of left knee with unspecified laterality knee pain. The Plaintiff was given a splint support immobilizer and a prescription of 5mg of OxyCodone upon discharge. The importance of the Rest, Icing, Compression and Elevation (RICE) was explained to the Plaintiff. **[EXHIBIT I]**[9]

27. On 6/22/20, Plaintiff was examined by orthopaedic doctor. Upon examination, subjectively the Plaintiff's had an aching, stabbing, throbbing constant pain in the left anterior knee, associated with weakness, swelling and instability. Objectively, there was a large left knee suprapatellar joint effusion, osseous avulsion of the tibial eminence/spine. The impression of the left knee X-ray was an anterior cruciate ligament (ACL) avulsion fracture. The Plaintiff was assessed with having a closed fracture

---

[7][G] Pictures taken of the hazardous area that was marked off and repaired.

[8][H] Washington County Emergency Medical Serivces (EMS) medical report for 6/19/20.

[9][I] Medical report from Zachary Smith, D.O of Meritus Medical Center Emergency Room on 6/19/20.

intercondylar spine and suggested a knee arthroscopy for treatment of intercondylar spines and/or tuberosity fractures with/without manipulation. The Plaintiff was advised to return for a surgery follow-up on 7/2/2020. **[EXHIBIT J]**[10]

28. On 6/24/20, Plaintiff underwent a surgery to remove the bony fragments of the tibial spine avulsed. There was some displacement, minimum winging of the articular cartilage injury pattern which was in line with the bony fragment and was in the center of the non-weight bearing portion of the articular cartilage. There was a 5mm tear in the posterior horn of the lateral meniscus right at the red-red junction. Any hematoma or loose bony debris was evacuated from the bed of the fracture. A tunnel was created for the passage of the sutures and fixation. The knee joint was irrigated and the knee was immobilized. **[EXHIBIT K]**[11]

29. On 7/2/20, Plaintiff returned for a post-operation follow-up visit. The incisions were healing nicely, sutures were removed and Steri-Strips were reapplied. There was very mild effusion and range of motion went from 5 to 30 degrees. There was good stability testing of the ACL. The Plaintiff was advised that she was allowed to bear weight on the left leg but not to lock out the knee. The Plaintiff was prescribed Norco 5mg-325 once every 6 hours or as needed for pain and Zofran 4 mg one every 8 hours or as needed by nausea and vomiting  Plaintiff was scheduled for another appointment in two (2) weeks. **[EXHIBIT L]**[12]

30. On 7/14/20, Plaintiff returned for her second post-operational evaluation and it was noticed that the Plaintiff keeps her knee bent at a 20 degree angle. As the tibial spine fracture continued to heal the plan was to begin unlocking the brace to work on range of motion. It was suggested that the Plaintiff leg is allowed to be straightened with weight-bearing as tolerated and to begin physical therapy. **[EXHIBIT M]**[13]

31. On 8/21/23, Plaintiff returned for her third post operation medical evaluation and Plaintiff was wearing incremental range of motion control brace and had been continuing with physical therapy. The Plaintiff stated that when her knee is bent too long and straightened

---

[10][J] Medical report from Jeffrey T. Gilsdorf, MD and X-ray finalized by Matthew Herczyk, MD of Orthopaedic Associates of Frederick on 6/22/20.

[11][K] Frederick Surgery Center Operative Notes from Jeffrey T. Gilsdorf, MD of Orthapaedic Associates of Frederick on 6/24/20.

[12][L] Post operation medical evaluation by Jeffrey T. Gilsdorf, MD of Orthopaedic Associates of Frederick on 7/2/20.

[13][M] Second post operation medical evaluation by Jeffrey T. Gilsdorf, MD of Orthopaedic Associates of Frederick on 7/14/20.

out her knee would tense up and she would experience a weird sensation in her upper thigh. The Plaintiff rated the pain level at a 6/10 when aggravated. The Medical doctor spoke with the Plaintiff's physical therapist to request increasing the Plaintiff's range of motion and moving forward in a regular ACL protocol and Plaintiff's brace was opened to full range of motion. Plaintiff lacked 6-10 degree of full extension and had a little effusion within the knee. It was suggested that the Plaintiff would be taken out of the brace all together in two (2) weeks to work more on the ACL protocol in order to increase strength and achieve terminal full extension. Plaintiff was scheduled to return in four (4) weeks. **[EXHIBIT N]**[14]

32. On 9/21/20 Plaintiff returned for a scheduled evaluation after continuing physical therapy and a home exercise program. There was a difference of opinion as to whether it was more beneficial to have Plaintiff use the Dyna Splint or not. The final decision was to have the Plaintiff continue home exercises. While the Plaintiff began to build strength in her leg, she had a tendency to hyper-extend on the contralateral side which makes extension a little more dissymmetric. The Plaintiff was directed to continue physical therapy adding a strengthening program with low-impact graded activities. **[EXHIBIT O]**[15]

33. On 11/16/20, Plaintiff returned for her fifth post operative medical evaluation and upon checking the post open reduction with internal fixation and there is a slight imbalance when the Plaintiff hyper-extends on the contralateral side. There was minimum swelling on the left leg. It was suggested that Plaintiff continue physical therapy once or twice per month for the next couple of months as the Plaintiff requires. A prescription for 8 physical therapy sessions/treatment was issued. **[EXHIBIT P]**[16]

## PAIN & SUFFERING

34. The Plaintiff (then 13 year-old 8th grader) made the terrible mistake of riding down the side walk in front of her house and striking a one inch elevated portion of concrete over top of the storm drain which threw the Plaintiff forward, causing the Plaintiff to suffer approximately **405 days or 57 weeks** (from the first to last medical visits) with a fracture of the left tibial spine. However, as Plaintiff continues to suffer from symptomatology associated with the injuries that were caused from the fall and it is not believed that the

---

[14][N] Third post operation medical evaluation by Donna L. Quesada, PA and reviewed and signed off by Jeffrey T. Gilsdorf, MD of Orthopaedic Associates of Frederick on 8/21/20.

[15][O] Forth post operation medical evaluation by Donna L. Quesada, PA and reviewed and signed off by Jeffrey T. Gilsdorf, MD of Orthopaedic of Frederick on 9/21/20.

[16][P] Fifth post operation medical evaluation by Donna L. Quesada, PA of Orthopaedic of Frederick on 11/16/20.

Plaintiff will ever be the same. Plaintiff will be examined to determined the permanency of her injuries. As a result of the fractured, Plaintiff experienced nausea, vomiting, and sever pain, swelling, weakness, instability, reduced range of motion loss, joint stiffness, effusion, of a constant, aching, stabbing and throbbing nature. The Plaintiff was later diagnosed with internal derangement, could not bear weight on her left leg and had to have the left leg immobilized. After a few post operation medical evaluations, Plaintiff was diagnosed/assessed with having left knee supapatellar joint effusion, osseous avulsion of tibial eminence/spine, anterior cruciate ligament (ACL) avulsion fracture and closed fracture intercondylar spine. Arthroscopy knee surgery was suggested which involved irrigation and evacuation of bony fragments. A 5mm tear in the posterior horn of lateral meniscus was noted at the right of the red-red junction. The Plaintiff rated her knee pain when it was aggravated by movement as high as 6/10. The Plaintiff performed home exercises, took X-rays, MRI's, attended nine (9) medical appointments and twenty-four (24) physical therapy sessions where she improved left knee strength, mobility, ambulation without crutches or brace. [**EXHIBIT Q**][17] Plaintiff was prescribed 10mg Ketamine for pain, 8mg ZoFran for nausea/vomiting, 5mg of Oxycondone and 5mg-325 of Norco. Therefore, the Plaintiff is demanding **$206,634.55** for the pain and suffering she had to endure.

## MEDICAL LIENS & SUBROGATION

35. The medical liens for unpaid for treatment are as follows:

| PROVIDER | SERVICE | BILL | OWED |
|---|---|---|---|
| Boonboro Ambulance & Rescue | EMS | $1137.00 | $1137.00 |
| Meritus Health General Hospital | Hospital | $24,511.71 | $0.00 |
| | Patient Deductible | $5,094.81 | $0.00 |
| Mid-Maryland Musculoskeletal Institute (MMI) | Orthopaedic Services | $5,776.59 | $0.00 |
| | Patient Deductible | $822.73 | $0.00 |

---

[17][Q] Physical therapy reports from BodySensePT for dates 7/14/20; 7/22/20; 7/28/20; 7/30/20; 8/5/20; 8/12/20; 8/14/20; 8/18/20; 8/20/20; 8/26/20; 8/29/20; 9/1/20; 9/3/20; 9/22/20; 9/29/20; 10/22/20; 10/27/20; 11/10/20; 2/5/21; 2/25/21; 3/22/21; 3/31/21; 5/24/21 and 7/24/21.

| Body Sense Physical Therapy | Physical Therapy | $5,644.00 | $0.00 |
|---|---|---|---|
| | *Patient Deductible* | $234.00 | $0.00 |
| Misc Medical Expenses | *Equipment* | $144.61 | $0.00 |
| **Total** | | **$43,365.45** | **$1,137.00** |

[EXHIBIT R][18]

The total of all medical bills incurred is **$43,365.45.** Therefore, the Plaintiff demands **$43,365.45** for the past incurred bills as a result of this incident.

### FUTURE MEDICAL COST

36. The Plaintiff physical condition is permanent. As a result the Plaintiff has been warned that she may develop further issues with her legs and hip in the future which might require further medical treatment. Plaintiff periodically has continued pain flare-ups or issues with exhausting the uninjured leg because of the uninjured leg overcompensation for the loss of strength from the injured leg. According to the Maryland Life Expectancy of a female, the Plaintiff is reasonably expected to live for approximately 79.9 years in Washington County. [**EXHIBIT S**][19] All things being equal and should the Plaintiff remain in Washington County, she is reasonably expected to live another 63.9 years and without any hope of the current disability getting any better without the aide of future medial procedures. Plaintiff has been assessed with a disability rating of _____%. [**EXHIBIT T**][20] Therefore, Plaintiff demands **$200,000.00** and for the future medical expenses (i.e., hospital stays, doctor exam, surgical procedures, diagnostic testing, prescription medications, physical therapy, rehabilitative therapy, mobility aids and medical equipment).

### HEDONISTIC VALUE

36. Hedonism loosely defined are the activities that an individual indulges in order to bring pleasure, gratification and satisfaction in life. Oftentimes, a person is deprived of such things when sudden accidents occur and a person is physically unable to engage in such

---

[18][R] All medical bills received.

[19][S] Maryland Female Life Expectancy by County according to the Institute for Health Metrics and Evaluation for 2014.

[20][T] Disability rating**********

10

activities. During the time of the incident, the Plaintiff was a scholar-athlete. The Plaintiff was straight A-student at Boonesboro Middle School and has maintained an A average at Boonesboro High with weighted advance placement (AP) courses. The Plaintiff also was dedicated to the sport, practice and training of/in Taekwondo. The Plaintiff had so much passion for the art and sport of Taekwondo because it was the only sport the Plaintiff felt she excelled at with a lot of hard work. The Plaintiff quickly advanced from the beginners white belt to a red belt where she became one of the youngest assistant instructors in the martial arts school she attended. Then the Plaintiff advanced to the rank of brown belt where she was steps from testing for her black belt and becoming one of the black belt instructors at White Tiger Martial Arts prior to this accident. **[EXHIBIT U]**[21]   The accident dashed Plaintiff's hopes of becoming a black belt and one of the martial arts instructors at her martial arts training school because the injuries Plaintiff received prevented her from being able to jump, maneuver, fully extend/lock her leg without a great deal of pain, discomfort and lack of confidence. Essentially the current state of the Plaintiff's injured leg is uneven in length because of issues with extension which causes pain with standing, sitting or walking for relatively short periods of time. The Plaintiff was advised that over time she may experience issues with her hips because of her posture. **[EXHIBIT V]**[22] The Plaintiff gained 30lbs because of the extended bedridden medical suggestions and inactivity. Even when the Plaintiff was able to ambulate more efficiently, she could not walk, stand, or sit too long as her knee would tense and lock up and create a greater risk of tripping or falling. The ideas of running or practicing martial arts was totally unimaginable. All Plaintiff's hard work and training became a thing of the past as Plaintiff had to come to a realization with her new reality and physical impediment of length difference in Plaintiff's legs and the inability to fully extend her injured leg.   As a result of Plaintiff's matriculation to the position of black belt instructor was cut short because of the accident, the Plaintiff demands **$50,000.00**.

WHEREFORE, Plaintiff respectfully request that this Honorable Court:.

A.   Order the Defendants pay $500,000.00 for compensatory damages.

B.   Order the Defendants pay interest and court cost.

C.   Order such other and further relief as the nature of Plaintiff's cause may require.

---

[21] [U] Plaintiffs advancement through the ranks and training at the White Tiger Martial Arts School along with awards and metals.

[22] [V] Pictures of Plaintiff's injury, X-rays, leg brace and uneven leg posture.

11

By: _____        6/19/23
Donnell H. McNeal, Esq. #0512140257                    Date
Law Office of Donnell H. McNeal
1300 Mercantile Lane
Suite 136-F
Upper Marlboro, MD 20781
Phone: (240) 764-5590
Facsimile: (240-764-5572
Email: donnellmcneal@DMcNealLaw.com

Attorney for *Plaintiff*

## JURY TRIAL DEMAND

Pursuant to Md. R. Civ 2-325(a), Plaintiff respectfully requests a jury trial in this matter.

## AFFIDAVIT

I solemnly swear and affirm under the penalties of perjury and upon personal knowledge, all the above statements are true and correct to the best of my knowledge and I am competent to attest to these matters.

By: _____        6/19/2023
SHARI WAGNER                                Date
(As Parent for AUDRIANA WAGNER,
Minor Child And Suffering, Individually
and as Parent and Next Friend of
AUDRIANA WAGNER, A Minor)
Plaintiff.